May it please the Court, my name is Kevin Keating and I represent Lawrence Lewis. I would like to begin with our sufficiency argument on count six, that is the violent crime in aid of racketeering, specifically the assault on Joanne Hinder. We attack that count on sufficiency ground on two bases. The first basis, I respectfully submit, is not even a close call. In order to sustain conviction on that count, the government was required to prove beyond a reasonable doubt that the predicate offense of assault in the second degree under New York State penal law had been committed. Assault in the second degree is defined by causing physical injury with a dangerous instrument. Physical injury, and there is a large body of well-entrenched case law on this subject, this is argued every day in state court, it's being argued right now in 100 Center Street. Physical injury has a precise meaning. It's impairment of physical condition or causing substantial pain. There was nothing, literally nothing in the record on that issue. Ms. Hinder testified that she was struck in the back of the head with a gun. That's it. You don't think that. Ouch. You don't think a jury can infer they're getting pistol-whipped hurts? A jury. A jury's allowed to infer things, right? 100%. And you don't think that getting pistol-whipped, just a common-sense inference, is that it hurts a lot? Your Honor, there's a difference between getting pistol-whipped and, yes, jury can. Well, hit in the head with the back of a gun, or the front of a gun, I guess, I guess you can hit them with any part of the gun, is getting pistol-whipped, right? I would respectfully disagree. Okay. Getting hit in the head with a gun. In this case, Ms. Hinder, all she said, she said nothing about force. There was nothing about injury, nothing about swelling, nothing about anything. Isn't it fair to say, contextually, knowing that he constrained her to endure what she then had to endure for days, wasn't it a fair inference that he was something less than gentle with her? Again, we're asking a jury to make fair inferences about what actually happened. I don't understand how you can see, you can fault a jury for reaching that conclusion after hearing about the brutal treatment that she was subjected to. That somehow, they were supposed to believe that, yeah, but maybe the pistol-whipping was light and gentle. But again, Your Honor, there is, respectfully, a difference between pistol-whipping and somebody being struck in the back of the head with a firearm. That was the sole quantum of evidence on that point. There was nothing, can a jury infer? Of course, a jury can infer substantial pain from the facts. But every single decision, and it's cited in our brief, which addresses that point, speaks to real injury. Speaks to, there's a shooting, there's a surgery, there's medical intervention, there are sutures involved. But the cases just say you have to have testimony from the witness that she suffered substantial pain. And they do say you can look at the surrounding context. And the surrounding context here is the defendant, based on the other evidence in the case, the defendant is eager to maintain his position in the gang after he's been humiliated by this woman. Can't we infer? I know you have an argument that we shouldn't infer that from the surrounding circumstances as to this charge. But the jury is allowed to look at stuff like that. Well, the jury can infer from the facts and circumstances of the assaultive event as to whether or not there was substantial pain or prolonged impairment. The jury should not infer based upon subsequent events. And I think the government actually advances that argument. The government seems to, or attempts to, tie in event which occurs day one, which hit in the back of the head with a pistol. And four days later, the unconsensual sex act. And the government combines these events in arguing that we can infer substantial pain from the entirety of that event. Well, you say for a thing, tell me if I'm wrong, that you would look to whether you seek medical care or not, right? That would be one factor. Okay. She couldn't seek medical care under the circumstances here. So that would be relevant to part of the analysis, at least in rebutting the availability of that as a factor. Certainly. That's one aspect, whether medical care was sought. But the force of the blow, there was no testimony as to that. Whether it caused pain, whether it caused swelling, whether it caused injury, whether it caused impairment. There was simply nothing. So the New York courts have said like a bullet graze without testimony that you just suggested is sufficient for inference of this element being met. Why is that different? Well, I think a bullet graze is by definition different because a bullet graze clearly is a forceful act by a penetrating object into the skin of an individual. If I hit somebody, if I slap somebody, that's harassment under New York State penal law because there is a definition of physical injury. If I take a firearm and I hit somebody with that firearm, without more, without more, it falls short. It falls miles short. So that's our argument as to count six. Argument two is the sufficiency argument as it relates to the Vicar murder involving John Burke and the Vicar assault as it relates to Ms. Pinder. And here the sufficiency argument is based upon whether a rational juror could have concluded that either event was done for the purpose of maintaining or increasing the position in the bloods. Let me begin with the John Burke murder because conceitedly that's a closer call. But what happens in the John Burke murder, it was a spontaneous, stupid, ridiculous, drunken event in a bar. It wasn't premeditated. It wasn't planned. It wasn't sanctioned. It wasn't organized. But there's gang signs being flashed back and forth between a notoriously feuding set of gang members. And it seems to me we have lots of cases that kind of fall along those lines and find that sufficient for motive even without specific testimony as to, you know, testimony about the motive here and the like. I think you're right to concede that a closer call. And you might want to move to the assault. You might want to move quickly to the assault. Let me be brief, and I will move quickly, Your Honor. But here with the Burke matter, it's not alleged that Burke flashed a gang sign. The actual facts very briefly were there was some other individual who was in the bar named Banks. They're taking photos together. It's not alleged that these people were, in fact, Crips members. They were perhaps associated. One of them, stupidly, ridiculous, drunken event, makes a Crips-size sign, not Burke. Somebody that the defendant is with goes over to this guy. They have an argument. My client then goes over to Burke. Burke flashed no signs. Him and Burke have an argument of some sort. But what about the testimony of Denise Hamill, your client's ex-girlfriend, that he acknowledged his role in the shooting and said he would die for the bloods? He did. What he said was that I would die for the bloods and I was disrespected. But this goes directly to the decisions in Bruno by this circuit, and more recently, the Garcia decision in the Tenth Circuit. And there were very similar facts in Garcia. In the Garcia decision, gang members who felt that they had been disrespected, they owed money to a drug dealer, the drug dealer was calling them names. There's a fundamental tenet in that gang. There's a fundamental tenet in every gang, that if you're disrespected, you shall react violently. But that does not mean every violent response to an act of disrespect should be considered a vicar crime. Actually, I'm not sure why it shouldn't be, if there's evidence that the disrespect was to somebody in a gang who felt that if I don't respond to an act of disrespect, I will lose status in the gang. Seems to me that if you do belong to a gang and you embrace that tenet, then yeah, you know what, a lot of things are going to be vicar murders and assaults. Because, unlike most members of the public, you feel like you need to respond to not lose status in your gang. So yeah, maybe many, many more gang assaults will be vicar. That doesn't seem like a surprising proposition. Well, Bruno and Garcia says otherwise. Well, Judge, I would argue as follows. That Garcia specifically says, if we're to treat every act of disrespect, every gang member, if they feel disrespected, they feel they have to act violently. There's a distinction between acting at the behest of the gang, acting at the behest of the racketeering. There is no behest requirement. You can act independently to say, if I don't do this independently, they're going to kill me. I mean, we just had the previous case where one member of MS-13 was killed, allegedly, because he looked weak in the eyes of the other gang members. And it could very well be the case that this is well known. If I look weak and I don't independently live up to the tenets of the gang, they're going to kill me. I mean, that's what just happened. We got a dead guy in the last case because of it. This is not unrealistic. Your Honor, I agree that depending on the facts and given circumstances, that the fear factor in not responding violently could lead a gang member to feel they have to do this in furtherance of the activity. I get that. But you have to look at the facts of the particular case. And that's what Garcia instructs. It's not a status crime. The mere fact that one is a gang member and they have this fundamental tenet does not mean every time they're disrespected and they act accordingly, it was indeed done to maintain... Well, there's a distinction there, right? Because it could be that nearly always there will be sufficient evidence from which a jury can draw the inference. But your proposition can also still be true, that a jury might make a case-specific factual determination that that inference is not warranted on the facts. But that's different from saying whether a jury would be permitted to make the inference, right? I agree. I agree. And in this case, I don't think a rational juror could have found as such, because there was an utter lack of evidence as to the public nature of this event, as to what was said between my client and the deceased during that argument. Nobody knows what was said. A spontaneous, drunken event in a bar room. And the danger here is that every single time you have an assault like this, it's suddenly a 20-year assault. Garcia speaks to a traffic dispute, a domestic violence event, where perhaps the other side raises the specter of a gang, and suddenly the person acts violently. The distinction is whether it's personal animus, or whether it indeed was done for the purpose of maintaining the position in the gang. And here, I argue there was an absence of evidence. Let me move, if I may briefly, as to the decision of the district court to reconvene the jury. After discharging the jury, I argue that the material facts are really not in dispute. The jury returned a verdict, guilty on all counts. The district court did what was customary. Thank you for your service. We ordered your lunch. You can go to a room. The alternates are in there. Feel free to talk. I'll stop in a little bit. They leave. They leave. And what happens? The government stands up, and it's essentially a whoops moment. Your Honor, there's two issues where the jury has to make further findings. And they're in the brief. One is felon in possession of a firearm, a bifurcated finding. The jury had not indeed found that the defendant was a convicted felon. This case, the government tries, government calls it a nominal discharge, the jury being nominally discharged. I'm not sure what that means, whether it was three. Well, why doesn't our decision in Rojas essentially render appropriate what the district court did here? So Rojas, I submit, was entirely different. In Rojas, there was an error by the clerk in the courtroom. The jury had returned a verdict. When they polled the jury, the clerk simply left out the word cocaine base in polling each juror. And they had found cocaine base in the determination. So Rojas, the Rojas court specifically held that we're not saying here a finding, our ruling would be the same if the jury was asked to do something other than that which they had already done. So in Rojas, they were simply being asked to reaffirm their verdict number one and number two. Rojas, they maintained the summer standard of presence and control. In Rojas, they went into the deliberation room. They were not exposed to outside individual or outside forces. And every single decision since summer cited in our brief, which speaks to this issue, they, in fact, did maintain presence and control. Jury discharge, they either stayed in the deliberation box, not subjected to outside influences, or went into a deliberation room where the evidence was clear, the facts was clear, they were not subjected to outside influences. Here, no dispute. They went into a different room. There were alternates in the room. And the court's attempt to correct the situation to the extent that it could even be corrected fell short. All the court asked is, please advise us whether you've been subjected to any communications during this five-minute period of time which may have influenced your verdict. The response was, all good, no impact. No impact, all good. Which, it doesn't address the standard, number one. Certainly suggests that they were exposed to outside influences. So that would address counts eight and ten. It's a structural error, not subjected to harmless error analysis. And certainly, it's de novo review. De Rosa speaks to that issue. Well, Rojas, forgive me, speaks to that issue. I know, I think I'm out of time. Well, I wanted to raise the issue of the rebuttal summation. I would ask the court to look closely at that. To argue that these were not personal prohibited attacks would be a false argument. The argument was the institutional role of defense counsel is to advance any argument because that's what they're paid to do. If I said that about the government, the court would have stopped me in my tracks, pulled me to sidebar, correctly so, and admonished me. So there's no place for that argument, and there should be consequence. Thank you. Thank you, Mr. Keating. We'll hear from the government. May it please the Court. My name is Assistant United States Attorney Mark Mazur. I'm an Assistant United States Attorney in the Eastern District of New York, and I was part of the trial team for the case before this Court. Taking the arguments in the order of counsel, advance them to your honors. In terms of the assault too, in the defense, in the reply brief, they cite to a case of Bauman. That was the case where they essentially said it was New York State law that the assault cannot be over the course of a long period of time. That case, it was in their reply brief, that assault occurred over the course of eight months. The assault in this case is more similar to the case of Okafor. And that said that if the assault occurs and is the product of a particular impulse, that it is appropriate under New York law to charge an extended assault. And the government's position of this assault too, of the victim, was always that the pistol whippening was the opening salvo in the assault. The impetus of the same impulse of the assault was the guns. That was the entire crux of the testimony. And the pistol whipping left this victim fully compliant for everything that happened over the course of the next two to three days. So in terms of assault too, I think we did establish from the pistol whipping going forward, the complete compliance, and everything happened thereafter, that we did in fact establish the assault in the second degree. Can I ask you to address one of the arguments that counsel didn't raise in moral argument? But that's the vicar motive with respect to the assault on Pinder. Yes, Your Honor. We've got a case called Ty where the court concludes that it was entirely financial motivation. And just the fact that there'd been another bombing or that, you know, that there were attacks on Asian businesses in order to raise money, those sort of general motivations was insufficient. This claim, help me see why this is dissimilar. And I'm not talking about the murder, I'm talking about the assault. So she steals guns. We don't have testimony that anyone in the, these were gang guns. There's no testimony that anyone knew about the stealing. All the testimony goes to him saying, you're going to have to repay me for the guns, for the weapons. It seems like, obviously the standard is well in your favor, but it feels a lot like Ty to me. Help me see the distinction. Your Honor, I would point to the fact that the victim in this case was immediately taken to a location where she was under control of associates of the defendant. The defendant, based on testimony of cooperators, had to make sure that those associates, and you know they were associates of the Bloods because they forcibly stripped her and made her take pictures, they forcibly prostituted her. So the defendant had to continue conducting the rules of the Bloods, which was, again, testified to by the cooperators. He had to maintain that image in front of those associates of the Bloods to further, at least at a minimum, maintain his position. I would submit that his treatment of that victim was very clearly an effort to advance his position within that enterprise. There was a Bloods Bible that was placed into evidence, and I believe generally the quote from that Bible before the jury was, any disrespect to a member of the Bloods. And I certainly understand the argument that you don't want to turn this into every single act by a defendant becomes vicar. But the jury did hear that there was a Bloods Bible that said, any act against the Bloods is against you, is against us, and you have to respond with violence. This defendant, based on the testimony before that jury, was out and about during assaults, running around yelling he was super Blood. He was the poster child for the Bloods. He had fully embraced the tenets of that enterprise. And he could not, I submit to the court, allow his associates to see him in any way, allow her to take the guns, and there had to be retribution. And I would point to the sheer, I'll call it an overreaction, the overreaction of what he did to her. I think the jury could infer that that was being sent as a message to everybody around him, including those associates. Did you make that argument in closing, as to the motive? No, I don't believe so. Could you address the jury discharge issue? The Supreme Court, indeed, I realize it didn't say anything about the terminal context, but it certainly didn't endorse a strong view that short periods of discharge can be overlooked. So could you address why we shouldn't be concerned here? Yes, Your Honor. I would point out, I would suggest to the court that the jury's work, and I'll address the Vicar murder, that the jury's work in terms of the Vicar murder was done. If you look at the transcript, the clerk, when they announced the jury's verdict, it read, as to count 10, discharging a firearm during a crime of violence, murder of John Burt, how do you find the defendant guilty or not? The jury endorsed that as guilty. They had found the discharge. And this is prior to what we contend was somewhat of a nominal discharge. The jury had already found discharge. The verdict sheet inadvertently told them not to continue once they didn't find brandishing. This was somewhat of a unique set of circumstances. So the jury's work was done. The felon in possession count, there was a stipulation that the defendant knew, was already convicted, and knew he was convicted. So to the extent that anything happened in the less than five-minute period where the jury was excused. I thought the jury instructions were, went to used, referenced use. I don't have them in front of me. But you're saying the jury was only instructed on discharge or brandishing? No, what happened is, so after they indicated guilty on the language where they used discharge, it then went on to brandishing. And it said, you know, do you find, found or not found? They said not found on brandishing, I believe. So your argument is because the jury form itself begins with discharge. Yes. That that was, that that's sufficient. Yes, because after the brandishing, it said if you don't find brandishing, don't continue to discharge. So it really was essentially the jury just checking the box, affirming what they had already found based on the verdict sheet in terms of the Vicar murder. Well, yeah. Not affirming what they already found, but you're saying it is inferred from what they found. Yes, yes. Well, what's going to happen to, so the felon, the felon in possession stipulation was put in. So they were going to break for lunch and then come back and do, put in the stip and then, and then deliberate on felon in possession? I don't know if they were going to break for lunch. The judge inadvertently excused them, I think forgetting that the felon in possession was bifurcated. So the stip had already been signed. And then there was the excuse. But not put in. Correct. Because, because of the nature of the stipulation. Right. So as to that element, nothing had been done at all at the time that the jury is discharged. Well, in terms of that element, but again, the stipulation had stipulated to every element, the last element of the crime. They'd already found the physical possession. It was just whether he or not Mr. Lewis was a felon. But so is that a, is that a harmlessness analysis or? Excuse me. I mean, that. Thank you. I understand the logic of the argument. I'm just trying to understand what structure you're putting that in. Your Honor, I think it still ultimately is a nominal excusal of the jury. The instructions that the district court judge, the inquiry of the jury, I haven't highlighted it from our brief. It was far more than a simple sentence request. I understand that the jury responded with a very brief, I think, three-word answer. But the judge did do her best. And I think it was adequate at that point. So just to make sure I'm understanding your argument, you're not arguing that you could, they could have, they didn't need to be brought back. Everything had already taken place that had to take place. You're saying that the, essentially your argument rests on the idea that the discharge was sufficiently nominal, that a district court judge has an inherent authority to bring back a jury that has been discharged to do this additional work. Yes, I do think that they should have been brought back for the felon in possession and belt and suspenders. They should have answered the question because it was a verdict form error. If that answers your question, I'm sorry. Um, so on the felon in possession, so I never had it bifurcated. But the idea would be, let's say it's, you reach this point in the trial. So it's, you've had jurors deliberating, which means the alternates have been separated for purposes of deliberation. Would the alternates have been brought back to hear the stip on the prior felony? In my experience, if the alternates are still there, they're brought back out and they hear the stip, yes. And then, so they hear the stip and you make closing arguments? Yes. And then, and then the alternates are separated out and, um, uh, and then the juror deliberates on, on the felon in possession. Logistically, yes, Your Honor. Yeah. So that, that would mean you, you, you have kind of, in the normal course, a mingling in and out of alternates potentially between deliberation and new presentation of final evidence. Well, but just to be clear, in this instance, the jury had already come back and found that the defendant possessed the firearm. The only thing they had not, uh, deliberated on was whether he was a felon and knowingly a felon. And the stipu, the stipulation stipulated that he was a felon and he in fact knew he was a felon. So it had, the, the final piece had already been stipulated. It does seem, I guess I, I want to go back to asking sort of what's the analytical structure that you're asking us to reach that conclusion? Because you could see that leading to the road of, well, okay, but we stipulated to four of the five elements and our evidence was overwhelming on the fifth and so they didn't need, you know, you could just, are you saying it's a harmless error? It's not a, it was an improper discharge and that's not a structural error? How do you want us to understand you're basically saying, even though a jury has to find this unanimously for there to be a conviction, no harm, no foul? I believe it was ultimately a nominal discharge. I think the total instructions given by the district court, again, even though the jury responded with about three words, I think it was sufficient. So you could have a nominal discharge and bring back a jury to deliberate on an entirely separate count that doesn't sort of follow or isn't subsumed in what's already been found by the jury? What's your case for that? I don't have a case for that. Can I turn to just a slightly different issue? I did want to touch briefly on the rebuttal summation. And if I'm correct, that was not you, right? No, sir. I did have a little concern with one of the lines there. I understand that closings are vigorous on both sides, on both sides. And there's a lot of, let's call it vigorous rhetoric on both sides. And that's to be expected. And I think juries can sort that out. But there was one point early in the rebuttal where the prosecutor suggested that what the defense summation was asking is that you rely on arguments of a skilled defense attorney who is paid to make arguments on behalf of his client. That strikes me as problematic. Yes, sir. I mean, not problematic enough to overturn this. I don't know in context. But I guess I am curious to know. The government didn't come out and say this in the brief. But does the government agree that that is not a proper form of argument? We do, Your Honor. In hindsight, we should have conceded that within the brief. I don't mean disrespect to say, again, pointing to the standard, as you just said. But no, that shouldn't be condoned. I don't believe there was any malintent by the AUSA. But that being said, no, that shouldn't have been said. I think it would be important for the court to know that the U.S. Attorney's Office understands that, again, even when there is vigorous argumentation to be had that there is an alliance that one does not cross and that one needs to control. No, the message is received, Your Honor. And it's fair for the court to point that out, I believe, unless there's anything further. Thank you, Your Honor. And we haven't reserved any rebuttal time. So thank you both. We will take the matter under advisement.